UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARMAN WILLIAMS,<br><br>        Plaintiff,<br><br>      -against-<br><br>NYC BOARD OF ELECTIONS; HEMALEE PATEL; DONNA ELLABY in her individual and official capacities; CAROL WINER in her individual and official capacities; JOHN AND JANE DOES 1–10,<br><br>        Defendants. | 23-cv-5460 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

 Carman Williams, a former per-diem poll worker with the Board of Elections in the City of New York, made an internal complaint via email that accused defendant Donna Ellaby of being racist. The next day, Ellaby told Williams that the Board would not be assigning her to early voting. Williams filed suit, alleging retaliation under federal, state, and city law. Defendants move for summary judgment, pointing to evidence that Ellaby decided not to assign Williams to early voting weeks before Williams made her complaint. Because no reasonable juror could find a causal connection between Williams's complaint and Ellaby's decision not to assign her to early voting, the Court grants summary judgment to defendants.

## BACKGROUND

 *Pro se* plaintiff Carman Williams began working as a poll worker with the Board in 2008. Dkt. 234 ¶ 5. She worked "consistently from 2008 to 2021." Dkt. 189-1 at 21.

 Per-diem poll workers are supervised by site coordinators, who are employees of the Board. *See* Dkt. 188 ¶ 6. Coordinators are "responsible for entering notes regarding any issues he or she experiences [at a] poll site during a voting cycle[]" in a journal. *Id.* Those journals are then transported to Board headquarters, where they are reviewed and then "transmitted to the appropriate borough office," where notes related to a poll worker are "entered digitally into the poll workers' poll worker record." *Id.* ¶ 8. "Notes in a poll worker's poll worker record reflect the date on which the note was entered," and each note "generally includes the initials of the person who digitally entered that note." *Id.*

 In October 2021, Williams was assigned to work early voting at Hunter College Brookdale in Manhattan. Dkt. 234 ¶ 25. One of the site coordinators, Carol Winer, reported in her October 27 journal that Williams was "angry," "defiant" and "bossy." Dkt. 189-26 at 30. On October 30, she reported that Williams had "repeatedly confused the days," "the numbers on the seals," and "the

colors of the seals." *Id.* at 37. Another coordinator, Robert Stepanek, reported on October 31 that Williams "was placing yellow plastic seals on areas where green plastic seals should have been placed during closing procedures." *Id.* at 45. On November 29, 2021, Donna Ellaby and Brian Cambrelen entered a note into Williams's poll-worker record that she was "reported to be unpleasant and critical of other PWs by EV [early voting] Coords," "[d]id minimal work," and was "[n]ot willing to help others" or "a team player." Dkt. 188-1 at 1; Dkt. 188 ¶ 9. On May 19, 2022, Cambrelen entered a note that Williams was not to be assigned to early voting. Dkt. 188-1 at 1.

This was not the first such note in Williams's poll-worker record, which contains negative evaluations dating back to 2014, including that she "[m]ade too many errors," "disappeared for hours," and "does not work." *See id.*[1]

Starting in March 2022, Williams contacted Debra Leible, manager of election day operations, "regarding working the polls for early voting in June." Dkt. 189-16 at 5. Leible responded, informing Williams that "voting training and assignments are handled at the borough level" and directing Williams to contact Donna Ellaby. *Id*. at 6. On May 31, 2022, Williams emailed Leible:

> I wrote previously and you directed me to contact Donna Ellaby; she has NOT responded to my messages regarding early voting assignments[.] I contacted the Early Voting Department and spoke with someone by the name of Brian who asked me to call him back on Wednesday. I called him back and he was not in the office[.] I have since tried to reach him post holiday and each time I call he is "on a phone call[.]" I left my number with a woman and he has yet to return my call[.] *Donna Ellaby, I believe is a racist who is trying to interfere with my ability to work and I believe this to be actionable legally as retaliation and will file a complaint with the appropriate agency under applicable law*.

*Id.* at 1.

On June 1, 2022, Ellaby emailed Williams the following:

> We will not be assigning you to Early Voting for the upcoming election in June. Your performance and behavior evaluation was not positive[.] We need you to demonstrate that you're a team player who is committed to serving the voter[.] We will reassess you for Early Voting after you have worked the upcoming primaries of June 28th and August 23rd.

*Id.* at 27.

Williams alleges that this action was in retaliation for the email she sent the day before, calling Ellaby a racist. She sues for retaliation under 18 U.S.C. § 1983, Title VII, the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL).

---

[1] Williams objects to the coordinator journals and her poll-worker record as inadmissible hearsay. As addressed below, both are admissible as business records, and in any event, the statements contained in them are admissible for a non-hearsay purpose. For example, the Court doesn't rely on the coordinator journals for the truth of the matter asserted; namely, that Williams was, for instance, "bossy" and "defiant." Rather, they are admissible to show that supervisors had been told that Williams had behavioral problems.

2

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Ordinarily, "[w]hen a *pro se* litigant is involved, the same standards for summary judgment apply, but 'the *pro se* litigant should be given special latitude in responding to a summary judgment motion.'" *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015) (quoting *Knowles v. N.Y.C. Dep't of Corr.*, 904 F. Supp. 217, 220 (S.D.N.Y. 1995)). However, "the appropriate degree of special solicitude is not identical with regard to all *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010). Where, as here, the *pro se* litigant is "a lawyer representing [her]self," courts have held that the litigant "receives no such solicitude at all." *Id.*; *see also* Dkt. 61 at 2. In this case, these varying degrees of solicitude are immaterial. Even affording Williams special solicitude, defendants' motion would be granted.

## DISCUSSION

### I. The motions for sanctions are denied

#### A. The Savino declaration

Williams moves to exclude the affidavit of Raphael Savino, Deputy Counsel for the Board of Elections, and the exhibits annexed to the declaration, on the basis that Savino was not disclosed as a witness. *See* Dkt. 219; Dkt. 188. In his declaration, Savino attests that (1) the Board's employee handbook and disciplinary process do not apply to Williams because she is a per-diem worker and not an employee of the Board, (2) the Board employs site coordinators to oversee poll sites who enter notes in "coordinator journals" about per-diem poll workers, and Williams's poll-worker record contains negative evaluations, (3) the Board prohibits photography and video recording at poll sites, and the Board received a report that Williams attempted to violate this rule, and (4) Williams has sent a series of threatening and discourteous emails to Board employees since summer 2022. *See* Dkt. 188. Attached as exhibits to the declaration are Williams's poll-worker record and four emails she sent to Board employees.

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . or at trial, unless the failure was substantially justified or is harmless." Although "the language in the rule . . . would imply automatic preclusion of the evidence, courts recognize that preclusion is a drastic remedy and therefore exercise discretion and caution." *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000); *see also Pal*

3

*v. N.Y. Univ.*, 2008 WL 2627614, at *3 (S.D.N.Y. June 30, 2008) ("[T]he Second Circuit has held that preclusion is a discretionary remedy, even if 'the trial court finds that there is no substantial justification and the failure to disclose is not harmless.'" (quoting *Design Strategy, Inc. v Davis*, 469 F.3d 284, 297 (2d Cir. 2006))). "In determining whether to preclude evidence under Rule 37(c)(1), courts examine: '(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" *Preuss v. Kolmar Lab'ys, Inc.*, 970 F. Supp. 2d 171, 175 (S.D.N.Y. 2013) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

Here, these factors weigh against preclusion. Defendants have not explained their failure to disclose Savino as a witness, but Savino's declaration is an important account of how the Board functions and poll workers are reviewed. Moreover, there is no prejudice to Williams because Savino "authored numerous emails, which were disclosed to [Williams] throughout discovery" and he was also "listed as a custodian on [d]efendants' Privilege log," so if Williams wanted discovery from Savino or to depose him, she could have done so. Dkt. 242 at 3; *see also Young v. Cabrera*, 2020 WL 7042759, at *7 (E.D.N.Y. Nov. 30, 2020) ("Defendants suffered little prejudice from plaintiff's failure to identify those witnesses in initial disclosures given that the witnesses were identified in interrogatory responses with ample time for defendants to depose them."). Williams fails to explain what prejudice she suffered or what discovery she would have taken if only Savino was formally disclosed as a witness, despite all the other indicia that he was involved in the events in question. The fourth factor weighs "slightly in favor of preclusion" given that "a continuance would require reopening discovery," *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 71 (E.D.N.Y. 2012), but on balance, preclusion is unwarranted.

Williams also makes several broad evidentiary objections to the Savino declaration and the attached exhibits. The Court addresses these objections as they relate to the declaration and Williams's poll-worker record because the Court does not rely on the remaining exhibits in deciding this motion. First, Williams argues that the declaration and poll-worker record are inadmissible under Rules 401, 402, and 403 of the Federal Rules of Evidence. *See* Dkt. 234 ¶¶ 9–10. But they are plainly relevant, and their probative value is not substantially outweighed by the risk of unfair prejudice. Second, Williams argues that Savino lacks personal knowledge and is not competent to testify "regarding what occurs at the Borough Offices" under Rule 602 of the Federal Rules of Evidence. *Id.* ¶ 10. It's not clear exactly what portion of Savino's declaration Williams objects to, but Savino states that his declaration "is based upon [his] personal knowledge as well as review of books and records kept in the regular course of business by the Board." Dkt. 188 ¶ 2. Given his position as deputy general counsel for the Board, a position Savino has held since 2012, his statement that he could testify based on his personal knowledge as to the matters in his declaration, and the declaration's contents—explaining attached documents and the operations of the board— Savino would be a competent witness at trial, and to the extent that the underlying documents he relies upon are business records, he can lay an adequate foundation for admitting those under Federal Rule of Evidence 803(6). *See Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017)

4

(holding that "material relied on at summary judgment need not be admissible in the form presented to the district court," "so long as the evidence in question 'will be presented in admissible form at trial'" (citation omitted)).

Finally, Williams objects that the negative statements in her poll-worker record about her performance are inadmissible hearsay and do not meet the requirements of the exception under Rule 803(6) for business records. Dkt. 234 ¶ 10. The Court disagrees.

As to the poll-worker record itself, it is admissible if "(a) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (b) the record was kept in the course of a regularly conducted activity . . . ; (c) making the record was a regular practice of that activity; (d) all these conditions are shown by the testimony of the custodian or another qualified witness, . . . and (e) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(A)–(E). These conditions are met here. As Savino testifies, a poll worker's record reflects notes made by site coordinator in their journals "on the date an incident occurs or soon thereafter," Dkt. 188 ¶ 6, and the practice of keeping notes on poll workers in this manner "has been the Board's policy since at least 1995." *Id.* ¶ 8. Savino is a qualified witness to testify to these issues, and Williams has not shown any indicia of untrustworthiness.

The record also contains some statements made by those other than the writer. For example, that a supervisor reported Williams's poor behavior or asked for her not to be assigned. *See, e.g.*, Dkt. 188-1 ("[Williams] reported to be unpleasant and critical of other PWs by EV Coords . . . . LIRA coordinator also asked NOT to ASSIGN."). Those statements are admissible because they are not offered for the truth of the matter asserted—that Williams behaved poorly. They're offered instead to show that supervisors at the Board were told that she had behaved poorly, providing an alternative explanation for why they didn't assign Williams to the polls. This suffices for consideration of these materials at this stage.

### B. The 2019 journals

During discovery, Williams moved for sanctions on the ground that defendants failed to produce coordinator journals from her work in 2019. *See* Dkt. 159 at 1. Defendants explained that "no notes were entered regarding [Williams's] performance during the twelve days she worked in 2019." Dkt. 169 at 2 (also stating that "no journals have been identified that would be responsive to [Williams's] request" for coordinator journals from her work in 2019). After discovery closed and summary judgment was fully briefed, Williams moved for sanctions pursuant to Rule 37, arguing that she uncovered evidence that defendants had these journals but failed to produce them. *See* Dkt. 248. Specifically, she filed a Freedom of Information Law request with the Board to "inspect and copy the 2019 Early Voting Coordinator Journals from P.S. 116." *Id.* at 10. The Board located records responsive to the request; to view them, Williams must pay $27.50. *See id.* at 10–12. Williams requests that the Court order defendants to pay the cost of viewing these records and deny the motion for summary judgment "given the blatant misconduct by [d]efendants and the resulting prejudice to [her] lawsuit." *See id.* at 7.

These requests are denied. Defendants didn't claim that no journals exist from 2019. They said that no notes were entered about Williams. The fact that the Board has identified records responsive to a generic request for coordinator journals does not undermine this representation. And no matter what is contained in the 2019 journals, the Court would hold that summary judgment is warranted on Williams's retaliation claims, given that Williams cannot prove that there was a causal nexus between her protected activity and the adverse action she suffered.

## II.    Summary judgment is granted on the § 1983 claim

Williams sues for retaliation under 42 U.S.C. § 1983. *See* Dkt. 1 ¶¶ 10–12. Defendants argue that they are entitled to summary judgment because the § 1983 claim is not based on "substantive rights distinct from Title VII." *Saulpaugh v. Montro Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) (quoting *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 576 (2d Cir. 1989)). As the Second Circuit has explained, "[a] plaintiff cannot use [§] 1983 to gain perceived advantages not available to a Title VII claimant, but a plaintiff can assert a claim under [§] 1983 if some law other than Title VII is the source of the right alleged to have been denied." *Id.* Because Williams doesn't identify any law other than Title VII, defendants argue, they are entitled to summary judgment on her § 1983 claim. Williams does not rebut this argument in opposition. Accordingly, the Court considers Williams's § 1983 claim abandoned. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Even if the § 1983 claim wasn't abandoned, it would fail on the merits. Williams's § 1983 claim is for retaliation, *see* Dkt. 1 at 7, and as discussed below, there is no genuine dispute that Ellaby communicated her decision not to assign Williams to early voting before Williams made her complaint.

## III.    Summary judgment is granted on the Title VII, NYSHRL, and NYCHRL claims

Defendants move for summary judgment on Williams's retaliation claims under federal, state, and city law. "To establish a prima facie case of retaliation, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). Defendants argue Williams has failed to adduce any evidence of a causal connection between her protected activity and the adverse action of which she complains.

The Court agrees. Williams argues that Ellaby's June 1, 2022 email advising Williams that she would not be assigned to early voting must be retaliation for the email she sent the day before, accusing Ellaby of being racist, based on the timing of the email and the fact that Williams had received no negative feedback on her performance.

But no reasonable juror could draw this inference, given that defendants point to evidence showing that the decision not to hire Williams for early voting was made weeks before Williams

6

complained about Ellaby. "Where there is evidence that the employer was considering the adverse employment action before any protected activity, the Supreme Court has held that an employer's 'proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" *Carmellino v. Dist. 20 of N.Y.C. Dep't of Educ.*, 2006 WL 2583019, at *19 (S.D.N.Y. Sept. 6, 2006) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). This is true even under the more solicitous NYCHRL standard. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 77 (2d Cir. 2015) (holding that plaintiff's retaliation claim under the NYCHRL failed because supervisor "took note of comments about [plaintiff's] 'over-aggressiveness and lack of tact'" and "expressed those opinions in a professional evaluation long before" plaintiff's protected activity).

Here, not only is there a notation in Williams's poll-worker record on May 19, 2022, that she should not be hired for early voting, but that same day, Ellaby emailed several Board employees that "[w]e do not intend to hire Ms. Williams for [Early Voting]. She was hostile, rude and disrespectful to the coordinators and coworkers. She did not do her job." Dkt. 189-12.

Williams argues that defendants are lying, and that they "paper[ed]" her file with negative evaluations after Ellaby sent her allegedly retaliatory email. *See* Dkt. 236 at 4. But there is no genuine issue of material fact to support this version of events.

First, Williams says that defendants must have made up these issues because she never had "any performance or conduct problems" during her fourteen years as a poll worker. *See* Dkt. 236 at 3. But whether Williams actually had performance issues is irrelevant. The only question is whether Ellaby had been so informed long before Williams's May 31, 2022 email, and the record is replete with evidence that multiple people reported that Williams had behavioral problems. Moreover, Williams's argument that she was never informed about any issues with her performance is contradicted by the record evidence. For example, an email from Ellaby to Williams in August 2016 explains that Ellaby was informed Williams "did no work" and that "[her] absence and . . . poor performance led to [her] removal" from two different polling sites. *See* Dkt. 189-3 at 5. "Because of this pattern of behavior," Ellaby explained, the Board would not assign Williams for the September election and would "consult with [the] management team regarding [Williams's] future employment." *Id.* Williams responded to this email, stating that if she was "not provided with an assignment for September, [she] most certainly [would] [d]eem it to be retaliatory and . . . fil[e] a lawsuit." *Id.* at 4.

Williams argues that Ellaby's May 19, 2022 email (indicating that she was not planning to assign Williams to early voting) and her August 8, 2016 email (referencing that Williams's "absence and . . . poor performance" led to her removal from polling sites) constitute inadmissible hearsay. *See* Dkt. 234 ¶¶ 16, 41. As an initial matter, given their nature, Ellaby or another competent witness can almost certainly establish these emails as business records under Rule 803(6). Aside from saying that they can't, Williams provides no substantive basis why these emails would not be admissible under that exception. But even if defendants cannot introduce these emails under Rule 803(6), Ellaby can testify as the discussions they reflect, and the emails themselves could be

7

introduced under Federal Rule of Evidence 801(d)(1)(B) if Williams were to attack Ellaby's credibility, which she already has. *See Smith*, 697 F. App'x at 89 (where statements "could readily be reduced to admissible form at trial through the testimony of the defendant officers," court "need not resolve whether the documents fall within . . . the business-records exception").

As for Williams's argument that the emails are irrelevant under Rule 401 or, in the alternative, that they should be excluded under Rule 403, these objections are meritless: The May 19, 2022 email is relevant to the causation inquiry, as described above, and does not introduce any risk of unfair prejudice or other issues contemplated by Rule 403. The same goes for the August 8, 2016 email, which is relevant to Williams's defense that she had never experienced any negative feedback as a poll worker (and if offered for this purpose, the email isn't hearsay at all).[2]

Second, and relatedly, Williams argues that she must have had a good record because she was assigned to early voting in 2019 and 2021, and the Board assigns "only the poll workers with the best records" to early voting. *See* Dkt. 236 at 19. But even if Williams worked without incident from 2016 to 2021, that doesn't change the fact that several Hunter Brookdale site coordinators commented negatively on her performance during 2021 early voting.

Third, Williams cites an email from Robert Fiore, who was present during early voting at Hunter Brookdale, which Williams says demonstrates "that there had been no issues [there]." Dkt. 236 at 13. Fiore's email to Ellaby was in response to an anonymous letter complaining about the poll site. *See* Dkt. 243-2. Fiore told Ellaby that the complaint about the poll site was unfounded; it was an "excellently run poll site" where "[e]veryone is happy with their role." *Id.* Fiore did mention that they "had one complaint about rotating inspectors between the poll pad stations and the scanners," which was made by "Carm[a]n Williams[,] and she was accommodated." *Id.* Fiore also explained that the coordinators "had very few behavioral issues with the poll workers this election." *Id.* Fiore's defense of the poll site in response to an anonymous complaint does not suggest that *no* poll workers had performance issues; if anything, the email supports the inference that Williams made things difficult at the poll site by being the only one to complain about her assignment.

---

[2] In her summary-judgment opposition brief, Williams also "objects" to consideration of a document—which might be the May 19, 2022 email discussed above, but it is unclear—which she says "was never disclosed during discovery," and was not in defendants' disclosures. Dkt. 236 at 16. It isn't clear what Williams is referring to and what discovery Williams would have pursued if this document were turned over sooner. Further, Williams has filed several discovery and sanctions motions in this case; she did not file a motion directed to the failure to produce during discovery the May 19, 2022 email, and it would have been clear upon—at the very latest—defendants' summary-judgment brief—that this was a key document on their motion. Williams's vague argument in her brief, if indeed it is referring to the May 19 email, fails to preserve any bid for preclusion under Rule 37. In any event, Williams fails to demonstrate that defendants "failed to timely produce the evidence with a 'a culpable state of mind,'" so sanctions are not warranted. *See In re Sept. 11th Liability Coverage Cases*, 243 F.R.D. 114, 129 (S.D.N.Y. 2007).

8

Fourth, Williams argues that Ellaby did not have the authority to discipline her. *See* Dkt. 236 at 19. She bases this on an op-ed that Ellaby published about "[w]hat reforms the [Board of Elections] needs from the worker's perspective." Dkt. 236-2 at 1. Ellaby explained in the op-ed that "[i]ndividual commissioners preside over and approve all disciplinary actions regarding employees, which is often just a reflection of the employees' standing with their party leaders." *Id.* at 5. As Savino's declaration makes clear, however, poll workers are per-diem workers, not part- or full-time employees of the Board, so the procedures described in Ellaby's op-ed do not apply to Williams. *See* Dkt. 188 ¶ 5. Although Williams purports to dispute this fact, there is no genuine dispute about it: Ellaby handled early voting assignments for the Manhattan Borough Office. And in any event, whether Ellaby technically had this authority is irrelevant to whether her email on June 1, 2022, was in retaliation for Williams's complaint on May 31, 2022.

Finally, Williams cites two recorded conversations between herself and Bryan Cambrelen and Carol Winer. In the first call, Williams called the Manhattan Borough Office on May 19, 2022, to find out about her early voting assignment. *See* Dkt. 236-1 at 2. After asking for Williams's information and observing that Williams was "over at Brookdale dorms . . . last election," Cambrelen stated that "we will try to place you back there again, but we still haven't been on the work assignments yet," and instructed Williams to call back in a few days. *Id.* at 3. Williams says that the Board is "bound by [Cambrelen's] representation" that they would try to send her back to Hunter Brookdale. Dkt. 236 at 17. But Cambrelen was clear that the Board had not finalized early voting assignments yet. Importantly, and perhaps prompted by Williams's inquiry, May 19 is the same day that Ellaby communicated to others the decision not to assign Williams to early voting, and the same day Cambrelen noted that in Williams's poll-worker record. So to the extent that Williams suggests that the call shows that there were no negative notations in her poll-worker record, or that the Board had not yet decided whether to assign her to early voting as of May 31, no reasonable juror could reach this conclusion based on either the call—which didn't address the issue—or the significant other evidence to the contrary.

In the second conversation, Williams approached Winer in the street and asked her whether she had ever complained about Williams to the Board, to which Winer responded "no." Dkt. 236-3 at 20. In her interrogatory responses, Winer explains that she "did not immediately recognize [Williams] when she was confronted by her on the street," given that Williams had previously worn a mask around her, and "with the shock" and "fe[eling] under attack," "she responded 'no' to the question." Dkt. 243-6 at 5–6. Winer confirms in her interrogatory responses that she complained about Williams in her coordinator journals after early voting in October 2021. *Id.* at 5. Even if Williams were permitted at trial to attack Winer's credibility—and the veracity of the coordinator journals—using her surreptitious, on-the-street, recording (the admissibility of which isn't addressed by the parties) this isn't enough to get over the summary-judgment hurdle by any stretch.

In sum, Williams's case turns on the timing of the May 31 and June 1 emails. But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at

9

252. That evidence is missing here: nothing, other than the timing of the emails, suggests that Ellaby's decision was based on retaliation. And the remaining evidence in the record demonstrates that the decision communicated to Williams in the June 1 email had been documented and shared internally weeks before Williams's complaint of racism. As the Supreme Court has explained, "proceeding along lines previously contemplated . . . is no evidence whatever of causality." *Clark Cnty. Sch. Dist.*, 532 U.S. at 272. Accordingly, no reasonable juror could find that Ellaby's decision not to assign Williams to early voting was in retaliation for Williams's complaint on May 31, so summary judgment is granted on Williams's retaliation claims.[3]

## CONCLUSION

For these reasons, summary judgment is granted in defendants' favor.

The Clerk of Court is directed to terminate Dkts. 186, 192, 243, and 248 and close this case.

SO ORDERED.

Dated: August 28, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge

---

[3] In their motion for summary judgment, defendants address another argument: that the decision not to assign Williams to early voting was in retaliation for a complaint she made on June 3, 2022, to the New York State Division of Human Rights (SDHR). *See* Dkt. 187 at 12. But in her response to defendants' statement of facts, Williams disputes that she makes this argument. *See* Dkt. 234 ¶ 2 (Williams admitting that she alleges that she was retaliated against after her email on May 31, 2022, but disputing that she alleges that she was retaliated against "after filing a complaint with the [SDHR]"). And in her opposition papers, Williams clarifies that "any actions post June 1, 2022, as it relates to Early Voting are not before the Court." Dkt. 236 at 7. Accordingly, the Court considers any retaliation argument related to the SDHR complaint abandoned.

Defendants also point out that the complaint "includes no causes of action for discrimination" but argue that "to the extent that the Court is inclined to construe the [c]omplaint as including discrimination claims," defendants are entitled to summary judgment on those claims because Williams "has demonstrated no evidence of disparate treatment or hostile work environment." Dkt. 187 at 20. The Court does not construe the complaint to include those claims, nor does Williams in her opposition to defendants' motion for summary judgment argue that the Court should do so. In fact, Williams in response to defendants' statement of facts explicitly stated that her "cause of action is <u>not</u> for a hostile workplace." Dkt. 234 ¶ 2.